IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 17, 2013

## CLIFFORD ERIC BURGESS v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 40500792     Michael R. Jones, Judge**

_____

**No. M2012-02064-CCA-R3-PC - Filed April 26, 2013**

_____

A Montgomery County jury convicted the Petitioner, Clifford Eric Burgess, of five counts of rape of a child, a Class A felony. The trial court sentenced the Petitioner to an effective twenty-five-year sentence in the Department of Correction. The Petitioner appealed his convictions, and this Court affirmed the Petitioner's convictions and sentences. *See State v. Clifford Eric Burgess*, M2008-01370-CCA-R3-CD, 2009 WL 2433059 (Tenn. Crim. App. at Nashville, Aug. 10, 2009), *perm. app. denied* (Tenn. July 20, 2009). The Petitioner timely filed a petition for post-conviction relief in which he claimed that he had received the ineffective assistance of counsel due to his attorney's failure to have him evaluated for mental illness. After a hearing, the post-conviction court dismissed the petition. After a thorough review of the record and applicable authorities, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Gregory D. Smith, Clarksville, Tennessee for the appellant, Clifford Eric Burgess.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; John W. Carney, Jr., District Attorney General; and Helen O. Young, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**
**I. Facts**

## A. At Trial

On direct appeal, this Court provided the following summary of the evidence at trial:

The State's first witness at the January 24-25, 2006, trial was the victim, who testified that she was born on August 9, 1992, and was currently thirteen years old. She said that from January to May 2002, when she was nine years old, she lived at 32 West Belair with her mother, brothers, sister, and grandmother. Her aunt, Pamela Newton, lived next door with the [Petitioner] and the [Petitioner]'s two- or three-year-old son, and she often visited at her aunt's home. The last time she saw the [Petitioner] was when he fled from Newton's home on the day that her aunt walked into the kitchen and found her performing oral sex on him. The victim testified that she and the [Petitioner] were together in the kitchen and she was in the process of putting away her fork when the [Petitioner] asked her to perform oral sex. She said she did what he asked, taking his penis into her mouth and sucking on it, because she was scared.

The victim testified that the kitchen incident was not the first time that she had performed oral sex on the [Petitioner]. She recalled a total of six times: "two in the garage, one walking, one bicycling, one at a dead end and one in the kitchen." She said that each time the [Petitioner] asked her to do it and she complied because she was afraid. She never initiated the contact, never wanted to do it, and never in any way attacked the [Petitioner]. The victim stated that she did not remember how frequently the contacts occurred, but agreed when the prosecutor asked whether they were "just seldom." When asked if she recalled what time of year it was, she replied, "All I remember it was sometime between winter." After having her memory refreshed by her statement to police, the victim also recalled that another episode of oral intercourse with the [Petitioner] occurred in his bedroom. She could not, however, recall anything more specific about the incident.

The victim testified that before he was caught by Newton, the [Petitioner] told her not to tell anyone about the incidents. After he was caught, he threatened to kill her and her family. On cross-examination, the victim denied having heard in 2002 about any sexual encounter between her older sister, M.M., and the [Petitioner]. She said she and her sister never had any conversations about the [Petitioner] and never discussed blackmailing him.

M.M., who was twenty-one years old at the time of trial, testified that

-2-

the [Petitioner] physically forced her to perform oral sex on him when she was seventeen. She said the incident occurred in August or September of 2001 during a time when her mother was gone to the store. She stated that the [Petitioner] came over to her house, entered her bedroom, unzipped his pants, pulled out his penis, and forced her head down onto his penis so that she was unable to move. She said she did not tell anyone about the incident at the time.

M.M. testified that she learned about the kitchen incident between the victim and the [Petitioner] at about 7:00 or 8:00 p.m. on May 14, 2002, when Newton awakened her and her brother by "yelling and screaming" that they had to get up and get out of there. She stated that Newton took them that night to their grandmother's house in Nashville. Sometime later in the week, Newton picked M.M. up from school and took her to the police department to give a statement. Because Newton threatened to kill her and her sister, she did not tell the police the truth but instead provided a fabricated story that Newton had instructed her to tell.

On cross-examination, M.M. testified that she told the police she had awakened the [Petitioner] by crawling into his bed and performing oral sex on him and that she had done the same thing with her mother's boyfriend. She also acknowledged having told the police that she believed the victim, who had overheard her talking with the [Petitioner] about how wrong her behavior had been, was attempting to blackmail the [Petitioner]. On redirect examination, M.M. testified that she had not, in fact, ever seen the victim behave inappropriately or heard her discuss blackmailing the [Petitioner].

Detective John Nichols testified that M.M.'s name did not come up during the course of his investigation until Newton brought her into the police department on May 20, 2002, where she gave her statement in the presence of Newton. He said that because her account was so different from Newton's May 14 statement, he was suspicious and believed that Newton had "brought [M.M.] in to influence and change the investigation." He stated that he had been unable to locate the [Petitioner] at that point, but Newton told him that she would find him and bring him in to give a statement on May 21.

Detective Nichols testified that the [Petitioner] admitted in his statement that oral intercourse with the victim had occurred but claimed that it had happened against his will: "[The Petitioner's] theory, or his explanation[,] was that this nine-year-old girl was fast enough, strong enough to pull his pants down, pull his penis out and suck his penis." He said the

[Petitioner] told him the victim had done it eight times, "but she had attempted some 25 times."  The [Petitioner] was very specific as to the locations but was uncertain about the dates of the incidents previous to the May 14 incident, other than that they had occurred from January to May 2002.

Both the videotape of the interview and the written statement were admitted as exhibits and published to the jury. The statement reads in pertinent part:

The night Pam saw [the victim] trying to push her self [sic] on me, [the victim] was told on several occasions to go home and that she had school in the morning by Pam and I [sic].  I told [the victim] to go home at least 5 times because I knew her reason for trying to stay.  That night [the victim] at two different instances grab[b]ed me in the testicals [sic] and practical[l]y fought me so that she could try to perform oral sex on me.  I tried to pry [the victim's] hand off of my testicals [sic] with out [sic] her hurting me, but was unable to do so before she succeeded in getting my penis in her mouth.  I became so dis[g]usted with her that I shoved her off of me pushing her backward towards the wall.  When Pam came to the door I did not know how much of what she was doing that Pam had witnessed.  This was not the first time [the victim] forced her self [sic] on me.  This happen[e]d on at least 6 or more different times.  Once when I was in the shower she knocked on the door and said she had to pee.  I told her she had to wait.  She entered the bathroom anyway pulling the shower curt[a]in back[,] grabbed my testicals [sic] and began to perform oral sex on me.  I[t] happen[e]d twice in the garage on two different oc[c]asions, once when she asked me to help her find an umbr[e]lla, and once when she asked me to help her get her bike out for her.  It also happen[e]d one night that Derick, [the victim] and I had taken the dog's [sic] for a walk, [the victim] had complained of her legs hurting and asked me to carry her.  I gave her a pig [gy]-back ride.  Derick and I raced toward the stop sign and with Derick leading [the victim] started rubbing on my chest and tr[y]ing to t[o]uch me funny.  I pushed [the victim] down and she ran off down another street.  This was after dark and concerned with her safety [I] went after her.  I followed her in an empty house drive way and behind the house she had her pants down.  I tried to explain to [the victim] that what she was doing was wrong.  She started crying and when I told her to pull up her pants she hugged me and then grab [b]ed my testicals [sic] and began to perform oral sex.

-4-

Detective Nichols testified that soon after he began his investigation, and before M.M. and the [Petitioner] had made their statements, Newton brought him a wanted poster of the [Petitioner] that she had placed in the neighborhood. He said that she was still upset about the incident she had witnessed and made no attempts to change her statement at that time. He identified the photograph from the poster and stated that it accurately depicted the more muscular appearance that the [Petitioner] presented at the time of the incidents. He said that the [Petitioner] informed him at the time of his statement that he was 6 feet tall and weighed 160 pounds. Detective Nichols also identified photographs of the victim, which he said were still frames taken from the videotape of her May 17, 2002, interview at the child advocacy center.

Finally, Detective Nichols acknowledged that he had referred several times in his interview with the [Petitioner] to the victim's aggressive behavior. He explained that it was merely a tactic he employed to get the [Petitioner] to open up about the incidents and said that he had no evidence that made him believe it was true. He testified:

Ms. Newton made a statement in the beginning explaining things that she knew. She later came in wanting to change her entire statement. She basically told the same thing except she informed me that it was all because of [the victim] becoming aggressive. No other place in any other had I heard anything about her being aggressive.

The [Petitioner] elected not to testify and rested his case without presenting any proof. The trial court dismissed counts three, four, and eight of the indictment, leaving the jury to deliberate on count one, the incident in the kitchen; count two, the incident in the [Petitioner]'s bedroom; count five, the incident in the garage; count six, the incident while out walking; count seven, the second incident in the garage; and count nine, the count charging the [Petitioner] with the statutory rape of M.M. Following deliberations, the jury found the [Petitioner] guilty of all five counts of rape of a child but not guilty of statutory rape.

**Sentencing Hearing**
At the sentencing hearing, the State introduced the [Petitioner]'s

-5-

presentence report, which reflected that the twenty-seven-year-old [Petitioner] reported he had a juvenile record consisting of an arrest at age sixteen in New Jersey for car theft, for which he had been sentenced to three years' detention. The [Petitioner], in turn, introduced a mitigation report prepared by Tracey Voight, a mitigation specialist and social worker in the district public defender's office. The mitigation report stated, among other things, that the [Petitioner] had reported that his mother suffered from paranoid schizophrenia and behaved violently and erratically toward him, his siblings, and his father; that his mother had disappeared from his life following his parents' divorce; and that he had become homeless at thirteen and been forced to drop out of school at the age of sixteen. Voight testified at the hearing that the jail's medical notes reflected that the jail's attending psychiatrist had prescribed schizophrenia medication for the [Petitioner], who had reported hearing voices and been seen eating his stool. On cross-examination, she acknowledged that the psychiatrist's notation of "paranoid schizophrenia" did not indicate whether he had diagnosed the [Petitioner] with that illness or that it was simply a possibility. She further acknowledged that the [Petitioner] had exhibited no signs of mental illness before he was convicted of the offenses and had reported that he had no history of mental illness to the investigating officer who prepared his presentence report.

### B. Post-Conviction Hearing

The Petitioner filed a petition for post-conviction relief, alleging that he had received the ineffective assistance of counsel. The post-conviction court held a hearing, during which the parties presented the following evidence: The Petitioner testified that he "didn't make it very far in school" but could "read, write and understand the English language." The Petitioner testified that he had been taking medication for "some years," because he did not "feel right sometimes." The Petitioner said that the medication prescribed for his paranoia makes him "feel better." He agreed that he was taking this medication before he was arrested in this case. He said that, at times, his symptoms had returned and so the medication was adjusted.

The Petitioner testified that his mother had paranoid schizophrenia and bipolar disorder. The Petitioner said that "kids" used to call him "crazy and stuff" and that he used to get into fights with other children frequently. The Petitioner said that he had tried to hide his mental illness his entire life because he did not want anyone to know that "something [was] wrong" with him. He recalled that, when he was a child, "Dr. Davis" told his father that "she believed [he] was paranoid schizophrenic." In preparation for his trial, he met with

-6-

Dr. McGee, who diagnosed him as "schizophrenic" and depressed. More recently, the Petitioner had been diagnosed with depression and prescribed Prozac. The Petitioner said that he was not on his medication when he gave his statement to police, which he believed affected his mental capacity. In addition, he believed he was coerced into giving his statement because a detective told him that he would be shot by a federal task force if he did not cooperate. The Petitioner agreed that he voluntarily went to the police station but felt he had no other option.

The Petitioner testified that he did not meet with his attorney ("Counsel") "very often" in preparation for his trial. Counsel told the Petitioner that she thought he was guilty and that he was not going to succeed at trial. The Petitioner said that Counsel was biased against him, and it affected her ability to represent him. He opined that because Counsel was a female and "possibly maybe a mother" she was biased against him. The Petitioner said that Counsel never reviewed the discovery for his case with him. Further, Counsel did not effectively address the Petitioner's mental health issues during her representation or adequately investigate the circumstances surrounding his statement to police. The Petitioner said that, "for the most part," he did not believe he had "any type of representation."

On cross-examination, the Petitioner agreed that police allowed the Petitioner to leave after giving his statement to police. He clarified, however, that the only way police would release him was if he gave a statement and "cooperated."

On recross examination, the Petitioner clarified that he only sought help for his mental health issues when he was a child. He explained that he avoided hospitals as an adult even though he knew "something [was] wrong."

Counsel testified that she was the original attorney assigned to the Petitioner's case, and she represented him through sentencing and also filed a coram nobis motion in his case. She testified that she had practiced criminal defense law for twenty-five years and tried over a hundred felony jury trials. Counsel recalled that the Petitioner was young and that the charges were "quite serious" making the case a "high priority" for Counsel.

Counsel testified that she met with the Petitioner on three occasions at the jail. Counsel said the Public Defender's office had a full-time investigator, but she did not recall requesting an investigation of any aspect of the Petitioner's case. Counsel explained that she did not identify any potential areas for exculpatory evidence necessitating further investigation, but if she had, she would have requested an investigation.

Counsel testified that she filed a motion to suppress in the Petitioner's case. There was a lengthy video recording of the Petitioner's statement to police. Based upon her review

of this recording, she explained that the Petitioner was very young, and she felt detectives were employing deceptive practices during the interview. She stated that, even though case law holds such practices are allowable, she felt it "very unfair." She described the motion as "extremely hard fought," and she recalled that she raised the issue again in coram nobis. Counsel said that she believed there was an issue with the Petitioner's mental capacity during the police questioning.

Counsel testified that, although she was not a trained mental health professional, she had become familiar with certain behavior patterns of mental illness through her work. Counsel said that, as a general practice, she inquired as to whether a defendant was on medication or had previously been to counseling. In the Petitioner's case, he was not on medication and had not been previously treated. Counsel then identified two post-trial emails that she wrote stating that she had missed the mental health issues in the Petitioner's case. The latter email was written after Counsel found out about jail staff transporting the Petitioner to a psychiatric hospital for eating his feces. Counsel said that the social worker in her office then met with the Petitioner and developed more background information relevant to the Petitioner's mental health history.

Counsel testified that, upon learning that the Petitioner's mother had mental health issues, she sought a mental evaluation of the Petitioner to present as mitigating evidence at his sentencing hearing. She also hoped the trial court might reconsider her pretrial suppression motion. Counsel was able to secure funding and hired a psychiatrist, Dr. Caruso, to evaluate the Petitioner. Initially, based on the information Counsel provided, Dr. Caruso opined that "it sounded like" the Petitioner had "genuine mental health issues." According to Counsel, after Dr. Caruso learned that the State's expert differed, Dr. Caruso told Counsel that he believed the Petitioner was malingering. Counsel said that she found this "enormously disappointing" because the money allocated for the evaluation had been used only to find that Dr. Caruso was of no assistance.

Counsel testified that Dr. Caruso's "actions" had a negative impact. She explained that the Petitioner's statements to police were significant. She had filed a motion to suppress the statements, but the trial court denied the request. She believed that, had she been able to provide the trial court with an adequate record of mental illness, the trial court might have reconsidered her pre-trial motion and suppressed the Petitioner's statement. Counsel said that, at the sentencing hearing, she proceeded with the other mitigation evidence prepared by the social worker but that this evidence was not as "powerful" as psychiatric testimony regarding the Petitioner's mental health. Counsel said she considered filing a complaint against Dr. Caruso because his "change of opinion in midstream" placed the defense at a significant disadvantage.

Counsel confirmed that the Petitioner's mental health issues were not raised until post-trial. She said she presented the issue at sentencing and hoped the trial court would revisit the motion to suppress.

Counsel testified that she wished she had created a better record with regard to a potential *Blakely* argument. She explained that the case law was new at that point, and she did not believe it would have changed the outcome at trial but that perhaps the trial court might have ordered a fifteen-year sentence rather than the twenty-five year sentence imposed.

On re-cross examination, Counsel testified that she did not recall the Petitioner's providing her with a list of witnesses. She said that, had he, she would have requested the office investigator interview the witnesses. Counsel said that, in retrospect, there was no other investigation needed in this case. The State provided Counsel with the emails earlier introduced by defense counsel in reference to the Petitioner's mental illness. Counsel agreed that the emails occurred between five and six months after the Petitioner's trial. Counsel agreed that she was, at the time of trial and the post-conviction hearing, very sympathetic to the Petitioner. Counsel said that she was "terribly disappointed" by the verdict and sentence. She agreed with the prosecutor's statement that she was "diligent" in her work on the Petitioner's case. Counsel agreed that she did not see any indication in the Petitioner's behavior that raised a concern of mental health issues nor did the Petitioner report a history of mental illness. Counsel maintained that the Petitioner did not participate well in his defense but agreed that it did not rise to the level of incompetence.

Counsel testified that the jail intake form indicated that the Petitioner denied any prior mental health treatment, attempts at suicide, and hospitalization for mental health issues. She agreed that the concern regarding the Petitioner's mental health did not arise until after he was convicted. Counsel agreed that she was unable to confirm that the Petitioner's mother had a mental illness because she was unable to find her.

Crystal Myers testified that she worked in the Clarksville Public Defender's office and represented the Petitioner on appeal. Myers said that, on appeal, she argued that the trial court improperly denied the motion to suppress the Petitioner's statements to police. Myers said that her only appellate attack based on mental illness was the writ of error coram nobis because the mental illness became more prominent after trial while awaiting sentencing. She said there was not a diagnosis in the case record. Myers said that she also raised sentencing issues related to *Blakely*. When asked, Myers confirmed that she "completely and adequately" represented the Petitioner on appeal.

On cross-examination, Myers testified that she read the trial transcript and case file in preparation for the Petitioner's appeal. She said that there was nothing in the file to

indicate that, prior to the Petitioner's conviction, he exhibited or experienced a mental illness.

After hearing the evidence, the trial court denied the petition for post-conviction relief, holding that the Petitioner had failed to establish that he was ineffectively represented. It is from this judgment that the Petitioner now appeals.

## II. Analysis

The Petitioner asserts that the post-conviction court erred when it denied relief based upon the ineffective assistance of counsel. He argues that Counsel's failure to identify and evaluate his mental illness before trial constitutes ineffective assistance of counsel. The State responds that the record supports the post-conviction court's determination that Counsel's representation was not ineffective. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2012). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's

-10-

errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad,* 938 S.W.2d at 369).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland,* 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515 (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of

the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

After hearing the evidence, the trial court concluded that the Petitioner had failed to show by clear and convincing evidence that Counsel was ineffective. In its order, the post-conviction court stated the following:

> [Counsel] testified that she missed the mental health issue prior to trial. After trial, a Motion for Mental Health Expert was approved and Dr. Keith Caruso was employed. From the testimony of [Counsel], Dr. Caruso's final opinion was that the Petitioner was "malingering." There was no mental defense in this case or the development of this issue in regards to the confession.

The evidence in the record does not preponderate against the trial court's findings. Counsel testified that the Petitioner assisted in his defense and did not exhibit behavior problems until after his conviction. Although Counsel was "sympathetic" with the Petitioner and believed he suffered from mental illness, she testified that the Petitioner did not report mental health issues and her communication with him did not raise any concern. The Petitioner's attorney on appeal, Myers, also testified that there was nothing in the trial record that evidenced a mental health issue. Further, the post-trial mental health evaluation indicated that the Petitioner was "malingering." Notably, no evidence in the post-conviction proceeding established that a mental health issue existed prior to or during trial.

Accordingly, we conclude that the trial court did not err when it denied the Petitioner's petition for post-conviction relief. The Petitioner has failed to show by clear and convincing evidence that Counsel's representation was ineffective and that he was prejudiced by Counsel's representation. The Petitioner is not entitled to relief.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly denied post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE